ROSE

v.

**BOWLING GREEN STATE UNIVERSITY.**

2003-Ohio-636.]

Court of Claims of Ohio.

No. 2001–04077.

Decided Jan. 31, 2003.

**4**

Harland M. Britz, for plaintiff.

Jim Petro, Attorney General, and Randall W. Knutti, Assistant Attorney General, for defendant.

ANDERSON M. RENICK, Magistrate.

{¶ 1} Plaintiff brought this action against defendant alleging breach of an employment contract.[1] The case was tried to a magistrate of the court on the issues of liability and damages.

{¶ 2} Plaintiff was employed by defendant as a professor of music and "artist-in-residence" in its College of Musical Arts beginning in 1963. Plaintiff's artist-in-residence status allowed him to teach half-time and to devote the other half of his assignment to his career as a professional pianist. On June 24, 1997, plaintiff signed a "Limited Service Agreement for Retired Faculty" wherein it was agreed that he would participate in defendant's "Supplemental Retirement Program" ("SRP"). The term of the agreement was for three years and plaintiff agreed to teach eight or nine semester hours during each fiscal year.

{¶ 3} On January 28, 1998, plaintiff sent a memorandum to H. Lee Riggins, Dean of the College of Musical Arts, regarding a proposal to teach during summer semesters. In his memorandum, plaintiff expressed his "hope" that his

---

1. Plaintiff's complaint also states a claim based on violations of Section 1983, Title 42, U.S.Code. However, it has been consistently held that 1983 actions against the state are not cognizable in this court because the state is not a "person" within the meaning of Section 1983. See, e.g., *Jett v. Dallas Indep. School Dist.* (1989), 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598; *Burkey v. S. Ohio Correctional Facility* (1988), 38 Ohio App.3d 170, 528 N.E.2d 607.

request would be granted "for 1999, 2000, and 2001 as well." On January 30, 1998, Paul Hunt, the chair of defendant's Department of Music Performance Studies, informed plaintiff that the initial year of his SRP assignment was to teach applied piano in the summer term of the 1998–1999 academic year. The memorandum informed plaintiff that his assignments for the following academic years would be determined by consultation among plaintiff, the chair, and the Dean. Although Hunt wrote in his memorandum that he did not foresee any "objections to the continuation of the aforementioned assignment," he noted that the chair and the Dean had "the flexibility of modifying [plaintiff's] assignment should it be in the best interest of the College."[2] Plaintiff accepted the assignment and completed the first year of the three-year SRP period by teaching applied piano during the 1999 summer term.

{¶ 4} On September 10, 1999, Virginia Marks, the chair of defendant's Department of Music Performance Studies, wrote plaintiff a letter notifying him that he had been assigned to teach during the spring term of the 1999–2000 academic year. The letter contained details of the assignment and directed plaintiff to sign and return the agreement by October 1, 1999. On October 1, 1999, plaintiff sent Marks a note that stated that he would reply to her letter the following week. In a letter to Marks dated October 8, 1999, plaintiff expressed dissatisfaction with the assignment and requested a meeting with Marks to reach "some amicable resolution of this situation in order to avoid any possible litigation."

{¶ 5} On October 18, 1999, Marks replied in writing to plaintiff's October 8, letter. Therein, Marks referred to Hunt's January 30, 1998 memorandum and expressed her belief that plaintiff's teaching assignment did not violate the terms of the SRP agreement. In her letter, Marks reminded plaintiff that the SRP allowed him to postpone his teaching assignment for one year by taking an approved leave of absence and to resume teaching in either the fall or spring semester of the next academic year. Marks also reiterated that a summer teaching assignment was not available "at this time." In a letter dated October 27, 1999, plaintiff rejected Marks's proposal and wrote that he would "not comment" on Marks's recommendation that plaintiff take a leave of absence. Plaintiff also offered to meet with Marks and Linda Dobb, defendant's Acting Provost and Vice President, on November 22, 1999.

{¶ 6} Although plaintiff met with Marks in November 1999, the issues regarding his subsequent teaching assignment were not resolved. In 2000,

---

2. Hunt sent a revised memorandum to plaintiff on April 28, 1998, that was substantially the same as the January 30, 1998, memorandum and showed that a copy was forwarded to Dean Riggins and Virginia Marks, who was the Piano Area Coordinator at the time.

plaintiff sent additional correspondence to Richard Kennell, Interim Dean of the College of Musical Arts, regarding his teaching schedule. On July 31, 2000, plaintiff informed Kennell that he still hoped to receive a summer teaching assignment and that he would not be able to commute to defendant's campus "starting the beginning of the semester in late August." In a letter dated December 15, 2000, plaintiff renewed his request for a summer teaching assignment and explained that he had been unable to accept the offer to return to Bowling Green to teach due to his teaching responsibilities in New York. In January 2001, plaintiff sent additional correspondence to Kennell and John Folkins, defendant's Vice President for Academic Affairs, in another effort to secure a summer teaching assignment. On January 24, 2001, Dean Kennell notified plaintiff that it was defendant's position that plaintiff "effectively withdrew" from the SRP when he declined to accept the spring semester 2000 teaching assignment that Marks had offered in September 1999.

{¶ 7} With regard to teaching assignments, the SRP agreement provided:

{¶ 8} "5. * * * The university will have the *sole discretion* to assign the hours and responsibilities of the Faculty Member. If the Faculty Member fails to perform services at acceptable levels, this agreement will terminate with no further responsibility of the University to offer the Faculty Member any further service opportunities.

{¶ 9} "6. The Faculty Member will sign an annual contract in each of the fiscal years covered by this agreement. Failure to sign an initial contract will indicate that the Faculty Member does not wish to keep the supplemental retirement option in force. *If for any reason the Faculty Member fails to sign subsequent contracts, this agreement will terminate* with no further responsibility of the University to offer the Faculty Member any further service opportunities." (Emphasis added.)

{¶ 10} Although plaintiff does not dispute that he declined to accept an assignment to teach an applied piano course during the spring term of the 1999–2000 academic year, he asserts that he took a leave of absence as suggested by Marks in her October 18, 1999 letter. Plaintiff further asserts that he notified Marks that he intended to take the leave of absence at the November 1999 meeting. According to plaintiff, Marks told him that he needed to notify Dean Riggins of his decision. However, Marks testified that plaintiff never requested a leave of absence and that she would have approved the request with a written agreement if plaintiff had made such a request.

{¶ 11} As a general rule, the goal of the court in construing written contracts is to arrive at the intent of the parties, which is presumed to be stated in the document itself. See *Foster Wheeler Enviresponse, Inc. v. Franklin Cty.*

*Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 678 N.E.2d 519, *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 667 N.E.2d 949. Where the terms of a contract are clear and unambiguous, the court cannot find different intent from that expressed in the contract. *E.S. Preston Assoc., Inc. v. Preston* (1986), 24 Ohio St.3d 7, 24 OBR 5, 492 N.E.2d 441. However, where the terms in a contract are ambiguous, extrinsic evidence may be relied upon to determine the intent of the parties. *Ohio Historical Soc. v. Gen. Maintenance & Eng. Co.* (1989), 65 Ohio App.3d 139, 583 N.E.2d 340.

{¶ 12} The only document that suggests that plaintiff requested a leave of absence is a letter that was sent to Dean Riggins after the spring term of the 1999–2000 academic year had begun. The March 28, 2000 letter refers to a request for a "postponement" of the SRP. However, Riggins's April 12, 2000 reply to plaintiff suggests that plaintiff take a sabbatical year and informs plaintiff that he would be required to teach in both the fall and spring semesters of 2000–2001 to satisfy the SRP requirements. There are no documents that establish that plaintiff either responded to Riggins's suggestion of taking a sabbatical or that plaintiff furnished a written request for a leave of absence. To the contrary, plaintiff's October 27, 1999 response to Marks's September 10, 1999 letter in which she reiterated the terms of the SRP agreement expressed indignation regarding Marks's suggestion that plaintiff take a leave of absence. Accordingly, the magistrate finds Marks's testimony that plaintiff did not request a leave of absence at the November 1999 meeting to be credible.

{¶ 13} Additionally, the content of plaintiff's correspondence to defendant's employees does not support his assertion that Riggins's March 28, 2000 letter confirmed that plaintiff had obtained a leave of absence with the expectation of teaching during the 2000–2001 academic year. Although plaintiff's correspondence emphasized his unwillingness to teach during the fall or spring semesters, both Marks and Riggins had informed plaintiff that he would be required to teach during the 2000–2001 academic year if he chose to postpone the spring 2000 teaching assignment. However, as late as December 15, 2000, plaintiff notified Marks and Dean Kennell that "it has not been possible to accept the offer" for him to teach during the 2000–2001 academic year.

{¶ 14} The magistrate finds that when plaintiff signed the SRP agreement on June 24, 1997, it became a contract that defined the terms and conditions of plaintiff's employment. Paragraph six of the agreement expressly states that defendant's obligation to employ plaintiff terminated if *for any reason* he failed to sign a subsequent contract after the initial annual contract. Marks's September 10, 1999 letter to plaintiff notified him that he was to teach his second SRP term during the spring 2000 semester and requested that he return the signed agreement. Plaintiff stated in his response that Marks's decision to assign him to

8

teach during the spring semester was a "clear violation" of the SRP agreement and he proposed a meeting to discuss a summer teaching assignment. The magistrate finds that plaintiff's October 8, 1999 response to Marks's letter was a rejection of defendant's proposed contract for a teaching assignment. See *Foster v. Ohio State Univ.* (1987), 41 Ohio App.3d 86, 534 N.E.2d 1220 (responding to an offer with alternate terms is a rejection and a counteroffer). Furthermore, plaintiff repeatedly expressed his opposition to teaching during fall or spring semester after he was advised that a summer teaching assignment was not available.

{¶ 15}   The magistrate further finds that the terms of SRP agreement that provide for its termination upon plaintiff's failure to sign an annual teaching contract are clear and unambiguous. Since the agreement is unambiguous on its face, this court will not create a construction contrary to its plain terms. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 544 N.E.2d 920, syllabus. The magistrate concludes that defendant's obligation under the SRP to offer him any further teaching opportunities terminated when plaintiff rejected the teaching assignment for the 2000 spring semester. Although Marks's October 18, 1999 letter suggested that plaintiff take a leave of absence, as noted above, plaintiff failed to establish that he had obtained such a leave.

{¶ 16}   Based upon the evidence presented, plaintiff has failed to prove that defendant breached his employment contract. Accordingly, judgment is recommended in favor of defendant.

So recommended.